**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **17 CR 65** |
| **v.** | ) | **Honorable John Z. Lee** |
| | ) | |
| **EDMUNDO LOPEZ PORQUILLO,** | ) | |
| **Defendant.** | ) | |

**EDMUNDO PORQUILLO LOPEZ'S SENTENCING MEMORANDUM**

The ancient labyrinth of Crete was built as a prison not only for a terrible beast, but for the people of Athens who were sent to Crete as sacrifices to the beast in the center of the Labyrinth. The twists and turns of the labyrinth were so great that no one could escape it. For two years the men and women of Athens were sent to feed the Minotaur inside the labyrinth, to punish Athens for allowing the king of Crete's son to be killed during the Panatheanic games. During the third year, Theseus begged his father, King Aegeus, to send him with the other Athenians to the labyrinth so he could kill the minotaur and protect Athens from these sacrifices. When Theseus arrived in Crete, he told King Minos he would kill the Minotaur, but King Minos knew that even if Theseus succeeded in killing the beast, he could never escape the labyrinth. King Mino's daughter, Ariadne, saw Theseus and fell in love with him. Deciding she wanted to help him, she gave him a length of thread and told him to attach the string to the beginning of the labyrinth so he could find his way out again. Theseus made his way to the center of labyrinth and slayed the minotaur. With Ariadne's thread, he was able to find his way out of the great prison and gain his freedom.

1

At a very early age, Edmundo was similarly forced to become a protector. He took on the responsibility of caring for his younger brothers at much too young an age, taking care of his them while his parents worked or drank. Although his parents were not poor, Edmundo felt poor as a child because his parents were either working, or were drinking and ignoring the children. Edmundo and his brothers were often left to care for themselves, because when their parents were home, they would drink to excess and fight once they became drunk. Edmundo would put his younger brothers to sleep and would wait silently in his small bed, listening for his father's voice to raise-- The first sign that there would be trouble again that night. He became skilled at identifying the point where his father would become violent, and would sneak out of his room, so as not to wake his sleeping brothers, to protect his mother from his father. As a young boy, when his parents would fight, he could only stand in between them, and beg his father not to hurt his mother.[1]

Once, at the age of 5, the family attended a party at Edmundo's aunt's house. Edmundo and his younger brother were sleeping in his aunt's bedroom when he was awoken in the middle of the night to the sounds of his father beating his mother. He ran out of the house to discover that his father had beaten his mother so severely that she had fallen into a coma and had been taken away to the hospital. Edmundo was taken to the hospital where he no longer recognized his mother through the bruises and swelling on her face. She remained in a coma for approximately 2 months. During this time, Edmundo and his brother lived with their aunt in hiding. His father, who had fled at the

---

[1] Edmundo objects to paragraph 51's characterization that there was no history of abuse or violence reported by him. As mentioned in the preceding paragraph, Edmundo reported that his parents "engaged in verbal and physical altercations." (PSR at. Para 50).

time of the beating, wanted to take Edmundo and his brother and disappear, so as not to get in trouble for the severe beating he had inflicted on his wife. After his mother was discharged from the hospital, she returned home with Edmundo and his brother. Slowly, Edmundo's father would return, wanting to come home, and eventually Edmundo's mother relented.

The beatings continued, and Edmundo would sometimes discover his mother bleeding in her bed, after what his father had done to her. When Edmundo was 15, his mother finally found the courage to end the relationship with Edmundo's father. By that time Edmundo and his brothers were big enough to protect her from their father. Edmundo no longer had to beg his father not to hurt his mother, he could physically his mother, and his father knew it.

As things improved in his home life, Edmundo began to make plans for his future. He hoped one day to save a little money so he could have his own small home with a family of his own. However the economic situation in Mexico was difficult, and the jobs that Edmundo worked offered very low wages and no opportunity for advancement. He realized that it would be very difficult to save enough in Mexico to buy the home he desperately wanted.

At a young age, Edmundo met a woman he thought he would start a family with. Together, the two came to the United States and Edmundo's girlfriend had a child. But she was restless and did not like being confined to a relationship with just one person. When their child was about one and half, Edmundo's girlfriend disappeared for two days. When she returned, Edmundo told her that he could not continue the relationship anymore, so she took their daughter and disappeared. Edmundo was devastated by the

loss of his family and turned to drinking. When he was arrested for a DUI in 2011, he believed he had a problem with alcohol and stopped drinking. (PSR at 62).

EDMUNDO soon met the love of his life, Ana Alvarez. With Ana, EDMUNDO realized his dream of having a family and home. When Ana became pregnant, the two discussed having ANA stay at home to take care of the children. He worried for Ana, after a cellphone store that Ana worked in was robbed and she, along with another employee, was ushered into a closet while the store was robbed. It was also important to EDMUNDO that his own children know from the start that their parents loved them and would be there for them. Having Ana at home meant their children would always feel loved and cared for.

It was very difficult on the family when EDMUNDO was taken into custody in this case. Ana was unable to run their family business by herself and she had to let go of the business's nine employees. (See letter of Ana Alvaraz). In January of 2019, the family was devastated when EDMUNDO's daughter, Ariadna, was caught in gang crossfire as she and her mother left the family home. Ariadna was shot in the stomach, and required surgery to repair a hole that was left in her colon. During this time, EDMUNDO was forced to sit and wait for news about his small daughter, worried that he may never see her again. When they speak on the phone now, she asks EDMUNDO if he still loves her and her little brother.

EDMUNDO has conquered his own beast though an incredible acceptance of his parents for who they are, recognizing that they are not bad people, but have suffered traumas of their own, which turned them into people who did not know how to parent young children. From his own childhood of absent love, EDMUNDO has learned the

4

importance of being a loving father and husband. He and Ana have spent many hours navigating the complicated immigration rules, and hope to receive their own visas in order to ensure that the family is never separated again. EDMUNDO now walks a long path with twists and dead ends, a path that threatens to keep him lost and away from his family. But there is hope, a small thread he must follow faithfully, given to him by his daughter, Ariadna, through the violence she suffered. EDMUNDO now has a chance to be reunited with his family after a long ordeal, but to remain with them, legally.

## I.      OBJECTIONS TO THE PRESENTENCE REPORT

**Education history**:

In paragraph 67 of the PSR, the officer wrote that Edmundo reported he completed ninth grade at "Secundaria Technica 93" and "ceased attending school in favor of obtaining employment." Edmundo graduated from this school with his diploma. Within the Mexico public school system, the ninth grade is the highest grade of public education available for children. Grades 10-12 are considered "preparatory" schools as precursors to university education, however, these schools are all private schools, and attendance beyond 9th grade is not mandatory. Thus, Edmundo went as far in school as was mandatory by Mexico, and as far as was provided by the public school system.

**Employment record**:

Edmundo objects to the characterization of his employment status as "unemployed" beginning on 12/19/2018 (PSR at para. 70). As noted in paragraph in paragraph 11 of the PSR, and page 2 of the government's version of the offense, Edmundo was discovered immigration officials on November 1, 2018. Edmundo was

arrested while leaving the Markham courthouse (PSR at para. 12) and has been in custody since that date, not unemployed.

Edmundo and has wife owned and operated a construction business together called "K.A.E. Lopez Construction LLC." Attached as an exhibit is LLC search indicating that Edmundo's wife is named as the president of the company.

Edmundo further objects to the characterization in paragraph 75 that he "stated he has not filed any federal income taxes, as he does not have a valid Social Security number." Edmundo was not asked whether he filed taxes, and has filed taxes on income from his business, K.A.E. Lopez construction. A copy of the taxes will be provided to the court if necessary.

**Military record:**

Edmundo objects to the characterization that he has no military record. (PSR at para 14). Military service is compulsory in Mexico. CIA World Fact Book- Mexico, avail at North America :: Mexico — The World Factbook - Central Intelligence Agency (last visited 8/01/2019). Edmundo entered the Mexican Army at age 18, completed his basic training, but was not selected for active service, and was honorably discharged.

### II. CALCULATION OF THE GUIDELINE SENTENCE

#### a. The sentencing range

The PSR and the plea agreement calculates EDMUNDO's base offense level for count 1 as 8, pursuant to USSG § 2L1.2(a). His offense level is increased by 4 points pursuant to USSG § 2L1.2(b)(1)(A) because committed the current offense after having been previously convicted of an illegal reentry offense. His offense level is reduced by

two levels because he has accepted responsibility, resulting in an adjusted offense level of 12. EDMUNDO receives six criminal history points and is in criminal history category III. The resulting sentencing range is 10-16 months in custody.

### III. A Sentence of Tine Served Would Best Satisfy the Goals of 18 U.S.C. § 3553(a).

The Court must impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2), " which are "the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7).

### a. The Need to afford adequate deterrence to criminal conduct.

Amongst the goals set out in 18 U.S.C. § 3553 (a)(2), the Court must carefully consider the need for the sentence to "afford adequate deterrence to criminal conduct." Indeed, the probation officer's recommendation of a sentence at the high end of the guidelines reflects his position that such a sentence is necessary to deter Edmundo from reentering the country again in the future. However, it is hard to understand how

increasing EDMUNDO's sentence by a handful of months will adequately address the causes of his recidivism.

Generally, research shows that certainty of punishment, not severity of punishment has a deterrent effect; "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006). Entry and reentry crimes pose a unique problem with respect to deterrence, as many of the defendants who seek illegal entry into the United States do so because they are fleeing crime or violence in their home countries, or come to the United States because of the vast economic disparity between their home countries and our own. Jonathan Hiskey, Abby Córdova, *Understanding the Central American Refugee Crisis, Why They Are Fleeing and How U.S. Policies are Failing to Deter Them.* American Immigration Council *Special Report* (Feb 2016). Furthermore, over half of all federal prosecutions are for immigration offenses, and after doubling down on a zero-tolerance approach and family separation policy for illegal border crossings under the current administration, there has been a surge in the number of border apprehensions in 2019. U.S. Customs and Border Enforcement, *Southwest Border Migration FY 2019*, available at https://www.cbp.gov/newsroom/stats/sw-border-migration (last visited August 2, 2019). Increased penalties for this type of non-violent defendant simply don't have a significant deterrent effect to justify the incredible cost both human and economic that these policies exact.

With respect to specific deterrence, "the available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect." Ellen Raaijmakers et al., *Exploring the Relationship*

*Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. of Research in Crime and Delinquency 1, 4 (2017). So while the probation officer advances a theory that EDMUNDO needs an increased sentence at the high end of the guidelines to deter him from reoffending, the social science evidence shows "[m]ore severe sanctions for those who committed a second crime 'appear to be more criminogenic. For example, among individuals whose first felony led to imprisonment, recidivism was lower when, in response to a second felony, they were sentenced to less severe sanctions . . . regular and intensive probation typically were associated with lower rates of recidivism.'" Daniel Mears & Joshua Cochran, *Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions*, J. of Research in Crime & Delinquency 24, 33 (2017).

The approximately nine months that Edmundo has served in custody is already the longest sentence he has served for any offence in his criminal history. The longest Edmundo had previously served in custody was 14 days. (PSR at para. 34). There is no explanation for why a sentence of six additional months will have more of a deterrent effect on Edmundo than the nine months that he as already served.

That nine-month period of time has already come at great cost to EDMUNDO and his family. As noted in the PSR and detailed further in the attached letters, EDMUNDO's daughter, Ariadna, was the victim of random gang violence when she was shot in the stomach while she left the family home with her mother. The bullet pierced her colon, and she required extensive surgery to repair the damage. During this time EDMUNDO could only sit and worry about his young daughter, wondering if her small

9

body would survive such an invasive surgery. He could not be with his wife or son to comfort them while Ariadna was in surgery, and he could not be with her when she awoke from the surgery.

EDMUNDO has also shown a change in thinking with respect to his immigration offenses, in that he and his wife are now already in the process of applying for an immigration visa so that they may remain in the United States together, legally. EDMUNDO is currently in the process of applying for an S-Visa, which is available to witnesses of crimes who provide assistance to law enforcement. His eligibility for this visa was the result of witnessing individuals in his neighborhood set fire to a home down the street from his own. One fire fighter was killed while fighting the fire. EDMUNDO reached out to the chief of the fire department to share the information that he had. Once EDMUNDO is released from the Bureau of Prisons, he will be transferred to Immigration and Customs Enforcement Custody, where the family's attorney can continue the visa process for EDMUNDO.

> **b.    The kinds of sentences available.**

Under the Sentence Reform Act, Congress explicitly directed sentencing judges, "in determining *whether* to impose a term of imprisonment," to "consider the factors set forth in § 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(a). Among the factors the Court must consider in choosing a sentence "sufficient but not greater than necessary," the Court must consider "the kinds of sentences available." *Id*. § 3553(a)(3). Congress further directed sentencing judges to "consider," as another factor, the "kinds of sentences" as well as "the sentencing range" that are set forth in the guidelines…issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28." *Id.* §3553

(a)(4)(A)(i).  With § 944(a)(1), Congress directed the Sentencing Commission to "promulgate…guidelines…for use of a sentencing court in determining the sentence to be imposed in a criminal case, *including… a determination whether* to impose a sentence of probation, a fine *or* a term of imprisonment."  28 U.S.C. §994(a)(1)(A) (emphasis added). Nothing in the Act creates a preference of imprisonment over a non-custodial sentence generally.

The Sentencing Reform Act therefore contemplated a system under which the Court would determine separately, and necessarily first, *whether* to imprison, not just how long to imprison, in light of the characteristics of the defendant, the circumstances of the offense, and all of the purposes of sentencing, considering a non-custodial sentence as one of the "kinds of sentences available."  18 U.S.C. § 3553(a)(1), (2), (3).

The Sentencing Reform Act as a whole makes clear that Congress expected imprisonment often to be deemed inappropriate.  Congress charged the Commission with "insur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 944(j).  Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." See Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

EDMUNDO is clearly neither a "violent" nor "serious criminal offender who pose the most dangerous threat to society."  His previous non-immigration offenses are DUI offenses, and while serious offenses, are surely not the type that is contemplated by the guidelines as someone who poses the most danger to society.  He is a family man who, until his arrest, ran a family business with his wife, that employed others.  He is a father who, as described further in the attached letters, is devoted to his two children.  Furthermore, he takes his position in his community seriously, not only helping his neighbors but helping assist in the investigation of a crime—providing sufficient assistance with an investigation that he is now eligible for a visa of which only 200 of such visas are available in any given fiscal year.

### III.  MISCELLANEOUS:

At the time of sentencing, members of Edmundo's family request an opportunity to address the court.

### IV.  CONCLUSION

For the foregoing reasons, EDMUNDO respectfully submits that a sentence of time served is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.


Respectfully Submitted,

s/ Quinn A. Michaelis
Quinn A. Michaelis
Attorney for EDMUNDO LOPEZ PORQUILLO
73 W. Monroe
Chicago, IL 60660
312-714-6920

## Certificate of Service

The undersigned attorney certifies that she caused a true and correct copy of the attached Sentencing Memorandum to be served upon the government by electronically serving it through the CM/ECF system on August 5, 2019

s/  Quinn A. Michaelis
Quinn A. Michaelis
Attorney for Edmundo Lopez-Porquillo
73 W. Monroe
Chicago, Illinois 60601
(312)714-6920